MONROE COUNTY CLERK'S OFFICE                    THIS IS NOT A BILL. THIS IS YOUR RECEIPT.

Receipt #

Book    Page

Return To:                                      No. Pages:  35
ELLIOT DOLBY-SHIELDS
192 Lexington Avenue, Suite 802                 Instrument: AMENDED COMPLAINT
New York, NY 10016
                                                Control #:      Unrecorded #8885860
                                                Index #:        E2021008206

                                                Date:

Pigott, Alyssa                                  Time:

The City of Rochester
Baxter, Todd

Total Fees Paid:                    $0.00
                                                Employee:

State of New York

MONROE COUNTY CLERK'S OFFICE
WARNING – THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

          JAMIE ROMEO

      MONROE COUNTY CLERK

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF MONROE**

---

ALYSSA PIGOTT,

                                          Plaintiff,

                      -against-

THE CITY OF ROCHESTER, a municipal entity, "JOHN DOE POLICE OFFICERS 1-200" (names and number of whom are unknown at present), COUNTY OF MONROE, TODD BAXTER, "RICHARD ROE SHERIFF'S DEPUTIES 1-200" (names and number of whom are unknown at present), and other unidentified members of the Rochester Police Department and Monroe County Sheriff's Office,

                                    Defendants.

---

INDEX NO.: E2021008206

**FIRST AMENDED COMPLAINT**
**[JURY TRIAL DEMANDED]**

Plaintiff, by her attorneys, ROTH & ROTH, LLP and EASTON THOMPSON KASPAREK SHIFFRIN LLP, complaining of the defendants, respectfully allege as follows:

## I.    __PARTIES__

1.    Plaintiff ALYSSA PIGOTT (she/her) is a resident of the City of Rochester, State of New York.

2.    Defendant CITY OF ROCHESTER ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the RPD.

3.    Defendant CITY OF ROCHESTER ("CITY") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York. Defendant CITY maintains the City of Rochester Police Department, a duly authorized police department,

Case 6:22-cv-06180-FPG   Document 10-2   Filed 05/27/22   Page 3 of 35

authorized to perform all functions of a police department. RPD acts as Defendant CITY's agent and Defendant CITY assumes the risks incidental to the maintenance of a police department and the employment of police officers.

4.      Defendant COUNTY OF MONROE ("COUNTY") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York. Defendant COUNTY maintains the Monroe County Sheriff's Office ("MCSO") and pays the salaries of the Monroe County Sheriff and MCSO deputies. MCSO acts as Defendant COUNTY'S agent and Defendant COUNTY assumes the risks incidental to the maintenance of the MCSO as the COUNTY's police department.

5.      Defendant TODD BAXTER ("Sheriff Baxter" or "BAXTER") was, at all times relevant herein, the duly elected Sheriff of the County of Monroe. At all relevant times, Defendant BAXTER was acting within the scope of his employment and under color of state law. He is sued in his individual and official capacity.

6.      "RICHARD ROE" MONROE COUNTY SHERIFF'S DEPUTIES 1–200 (the names and numbers of which are currently unknown), were, at all times relevant to this Complaint, Deputy Sheriffs with the Monroe County Sheriff's Office ("MCSO"). At all relevant times, these defendants were acting within the scope of their employment with the County and under Sheriff BAXTER and acting under color of state law. They are sued in their individual capacities. They are referred to collectively as "the Sheriff's Deputies."

7.      BAXTER is responsible for the training, supervision and discipline of the Defendant Sheriff's Deputies under state law.

### III. JURISDICTION

8.      This action falls within one or more of the exceptions as set forth in CPLR

Section 1602, involving intentional actions, as well as the defendant, and/or defendants, having

acted in reckless disregard for the safety of others, as well as having performed intentional acts.

9.      Ms. PIGOTT sustained damages in an amount in excess of the jurisdictional

limits of all the lower Courts of the State of New York.

10.     Ms. PIGOTT filed timely Notices of Claim against the City and County, in

compliance with the Municipal Law § 50.

11.     The CITY held a 50-h examination on June 8, 2021, and County waived a 50-h

hearing for Ms. PIGOTT.

12.     More than thirty (30) days have elapsed since service of said Notices of Claim

were filed and the City and County have failed to pay or adjust the claim.

13.     This action is being brought within a year of the event that gives rise to Ms.

PIGOTT causes of action under New York State law and Plaintiff has complied with all of the

statutory prerequisites for bringing this action.

### IV. STATEMENT OF FACTS

**A. Facts Common to All Causes of Action.**

14.     On March 23, 2020, Daniel Prude's family sought help from the Rochester Police

Department ("RPD") as Daniel was suffering an acute mental health crisis. Tragically, that call

for help ended with Daniel naked and handcuffed with his face covered by a "spit hood," as an

RPD officer pushed his head into the freezing asphalt for several minutes. RPD officers on the

scene mocked Daniel and chatted with each other while he asphyxiated. Daniel was declared

brain dead that night; he was taken off life support and died on March 30.

15.    When the video of RPD Officers killing Daniel Prude was finally made public on September 2, 2020, it sparked nationwide outrage. In Rochester, thousands of people gathered to mourn the loss of Black lives, demand the CITY finally end its racist and brutal policing practices, and call for new visions of public safety that value Black lives.

16.    On September 2-6, 2020, the defendants responded to peaceful protests with extreme violence—including the indiscriminate use of tear gas and pepper spray, 40 millimeter blunt-impact projectiles, thousands of pepper balls, flash-bang grenades and other supposedly "less-than-lethal" munitions.

**Saturday, September 5, 2020 to Sunday September 6, 2020**

17.    Like they did on prior nights after the video of RPD officers killing Daniel Prude was released, on the night of Saturday September 5-6, 2020, RPD officers and Sheriff's deputies used military grade weapons to attack peaceful protesters in downtown Rochester.

18.    Ms. PIGOTT attended the protest in her capacity as a volunteer street medic, to provide basic first aid treatment to injured protesters. She was wearing a helmet with a red cross on it to indicate that she was a street medic.[1]

19.    RPD officers and Sheriff's Deputies first escorted Ms. PIGOTT and other protesters as they marched in the streets of downtown Rochester, until they led marchers to the intersection of Broad Street and Exchange Boulevard, which law enforcement had closed to vehicular traffic with metal barricades.

---

[1] See Emma Grillo, *Where Protesters Go, Street Medics Follow, New York Times* (June 12, 2020), https://www.nytimes.com/2020/06/09/health/unrest-protests-street-medics.html

20.     At approximately 10:20 p.m., the John Doe RPD Officers and Richard Roe Sheriff's Deputies kettled and trapped Ms. PIGOTT and hundreds of other protesters at the intersection of Broad Street and Exchange Blvd.

21.     Ms. PIGOTT and the other peaceful protesters sang and chanted for several minutes until approximately 11:25 p.m., when RPD officers and Sheriff's deputies suddenly began to launch flash bang grenades, release tear gas, and shoot pepper balls into the crowd.

22.     After RPD Officers and Richard Roe Sheriff's Deputies attacked protesters with chemical weapons, flash bang grenades and other "less lethal" weapons, Ms. PIGOTT and others in the crowd moved north on Exchange Boulevard across Main Street onto State Street.

23.     At approximately 11:30 p.m., the RPD suddenly set off a flash bang near where Ms. PIGOTT was standing on the sidewalk, and then began shooting pepper balls and other chemical weapons at protesters.

24.     Ms. PIGOTT attempted to take cover in the nook of a building.

25.     While taking cover in the building nook, Ms. PIGOTT was targeted and shot with one or more pepper balls by a RPD Officer and/or Sheriff's Deputy.

26.     An RPD Officer and/or Sheriff's Deputy threw a tear gas cannister at Ms. PIGOTT while she was present in the building nook, which engulfed her in tear gas.

27.     Thereafter, at approximately 12:30 a.m., on the sidewalk on Fitzhugh Street in the vicinity of Spiritus Christie Church, a group of RPD officers rushed at Plaintiff without warning, causing her to fear for her physical safety.

28.     As the RPD officers ran towards her, some of the RPD officers shot pepper balls at her.

29.    Because officers ran and shot at her, Plaintiff attempted to disperse from the area, but tripped and fell on the sidewalk, causing her to fracture her right wrist.

30.    At no time did Ms. PIGOTT commit a crime or violation.

31.    Defendants lacked cause or any legal justification for rushing at her or seizing Ms. PIGOTT.

32.    No reasonable officer would have believed they had reasonable or probable cause to seize or arrest Ms. PIGOTT.

33.    Any reasonable officer should have known that by aggressively rushing at peaceful protesters and shooting pepper balls at them, like Ms. PIGOTT, the officers could cause the peaceful protesters to sustain injuries by, among other things, tripping and falling.

34.    As a result of the chemical weapons Defendants used against her on September 5-6, 2020, Ms. PIGOTT sustained irritation to their skin, eyes, mouth, nose and lungs and menstrual irregularities.

35.    Ms. PIGOTT also sustained pain, bruising and swelling from being shot with pepper balls and emotional and psychological harm from being attacked by the RPD officers and Sheriff's Deputies.

36.    As a result of the wrist fracture, Ms. PIGOTT missed significant time from work and significant lost income.

B.    **Coordination Between the City and RPD, and County and BAXTER, to Develop the Unlawful Protest Response Plan.**

37.    For months before the body worn camera video of RPD officers brutally killing Daniel Prude was released, the CITY and RPD anticipated and planned for large-scale protests when the video was eventually released. The City and RPD coordinated with the County, BAXTER and MSCSO to develop a joint protest response plan.

38.     From the very beginning, policymaking officials of the City and RPD (including former Chief Singletary), and the County and MSCO (including BAXTER), zeroed in on the fact that, unlike other protests, these were focused directly on police misconduct and racism; policymaking officials at the highest levels subscribed to the theory that Black Lives Matter protests are led by a nationwide conspiracy of outside agitators bent on violence.

39.     This manifested in the training of their officers, both before and since, that nonviolent protestors will stand in front to shield violent protestors who throw objects from behind them, and that not everyone standing with their hands up is peaceful. That training conveniently justifies and encourages suppressing all protestors by collectively punishing nonviolent ones. The message to their officers was clear: there is no such thing as a peaceful protestor.

40.     During those several months—from at least June 4, 2020 to September 2, 2020—the CITY and RPD developed a protest response plan that included responding to peaceful protests with extreme violence; using military-grade weapons against protesters; using overwhelming amounts of chemical weapons against groups of protesters, without making individualized determinations that probable cause existed to believe that any individual within the group had committed a crime or violation; and otherwise to retaliate against protesters based on their objection to the message protesters were expressing.

41.     Prior to the protests that erupted on September 2, 2020, former RPD Chief La'Ron Singletary and Monroe County Sheriff TODD BAXTER, along with other final policymakers with respect to police practices for the City and County, designed and orchestrated the unlawful protest response plan.

42.     RPD officers and MCSO deputies were ordered by Singletary, BAXTER and other final policymakers to suppress the protests: RPD officers and MCSO deputies were given military-grade equipment and authority to spray and gas indiscriminately, aim high with pepper balls and KIPS, and inflict pain as a deterrent.

43.     The multi-agency response to the September 2020 Black Lives Matter protests was managed under a Unified Command (UC) system between the CITY and the RPD; the COUNTY, MCSO and BAXTER.

44.     On the nights of September 5-6, 2020, policymaking officials for the RPD and CITY, along with BAXTER and other policymaking officials of the MCSO and County, were present in the Command Posts and were overseeing and directing the response of the RPD officers and Sheriff's Deputies to the protesters—including the use of specific tactics and weapons.

45.     The natural, inevitable result of the City and County policies is exactly what transpired: officers complying with official policies on the use of the "less lethal" force caused serious injuries peaceful protestors and others who were there to document and record the law enforcement response. Therefore, there was a "direct causal link" between the offending policies and the constitutional deprivations Ms. PIGOTT suffered; in other words, Ms. PIGOTT'S particular injuries were incurred *because* of the execution of the unlawful City and County policies.

46.     Over the Course of three nights, from September 2-6, 2020, RPD officers and Sheriff's Deputies implemented the unlawful protest response plan (PRP) and responded to peaceful protests with extreme violence:

- The City and County Defendants created a Unified Command (UC) to establish a common set of objectives, strategies, and a single "protest response plan" (PRP). The objective of

this coordinated protest response PRP was to create an intimidating, militarized, multi-agency response under a unified command system. Under the response plan, the City and County Defendants trained and instructed RPD officers and Sheriff's Deputies to use force against "groups" of protesters, without first having made an individualized determination that there was a lawful basis to use force against any individual in the group based on their own individual conduct, as opposed to the perceived "group conduct."

- RPD officers fired tear gas canisters 77 times into groups of protesters expressly gathered to support Black lives, at journalists, and at legal observers and others attempting to report on and record the abuse, and at medics there to provide care and safety to the protesters—often after they blocked off all escape routes to get away from the chemical clouds. The tear gas canisters are themselves projectile weapons capable of causing significant blunt trauma, including bone fractures, lacerations, internal bleeding, and death. One protester struck in the face by a canister required stitches inside and outside of her mouth and has permanent facial scarring.

- Over those three nights, RPD officers discharged 6,100 pepper balls at people protesting the Departments' aggressive and racist practices. RPD officers shot protesters with 40mm direct-impact foam bullets—kinetic impact projectiles ("KIPS")—which can cause a range of injuries including death. KIPs are inherently inaccurate when fired from afar and so they often injure bystanders and strike vulnerable body parts of intended and unintended targets. RPD officers fired CTS 40 mm munitions during the protest. The CTS website cautions that shots to the head, neck, thorax, heart, or spine can result in fatal or serious injury. Use of force reports by RPD officers detail deploying 40mm munitions at individuals' abdomens at the September 5 demonstration. RPD officers also used flash bang grenades, deployed sonic weapons, and struck protesters with batons.

- RPD officers and Sheriff's Deputies fired the "less lethal" munitions indiscriminately into crowds of protesters, including the indiscriminate use of tear gas and pepper spray, 40 millimeter blunt-impact projectiles, thousands of pepper balls, flash-bang grenades and other supposedly "less-than-lethal" munitions.

- RPD Chief La'Ron Singletary, a policymaker for the CITY on police practices, designed and implemented the protest response plan on behalf of the CITY, and implemented the unlawful policies that required RPD officers to use chemical weapons indiscriminately against protesters, despite knowing that the chemical weapons cause serious and permanent harm, such as permanent harm to the female reproductive system; and to otherwise use unlawful and excessive force against protesters, journalists, legal observers and others as detailed herein, in violation of their First, Fourth and Fourteenth Amendment rights.

- Monroe County Sheriff TODD BAXTER, a policymaker for the COUNTY on police practices, designed and implemented the protest response plan on behalf of the COUNTY, and implemented the unlawful policies that required Sheriff's Deputies to use chemical weapons indiscriminately against protesters, despite knowing that the chemical weapons cause serious and permanent harm, such as permanent harm to the female reproductive system; and to otherwise use unlawful and excessive force against protesters, journalists,

Case 6:22-cv-06180-FPG    Document 10-2    Filed 05/27/22    Page 11 of 35

legal observers and others as detailed herein, in violation of their First, Fourth and Fourteenth Amendment rights.

47.    Moreover, City officials effectively ratified the RPD's violent response. While hundreds of peaceful protesters, many of them Black and brown, were injured by RPD's violent response to the demonstrations, the Department condoned its officers' actions. Former RPD Chief Singletary praised RPD officers, saying publicly that they "showed restraint" when many peaceful demonstrators, including elected officials, were shot in the head with pepper balls, pepper sprayed, and worse. RPD Deputy Chief Mark Mura declared that the tactics RPD officers used were "tactful, *per policy and training*, and appropriate for the situation at hand." Former Mayor Lovely Warren also praised RPD officers: "[Y]ou made us very, very proud."

48.    The widespread use of pepper spray, pepper-balls, tear gas, and other types of "less lethal" weapons belies any claim that individual officers were acting on their own rather than implementing a preconceived municipal plan.

C.    **The Effects of Teargas and Other Chemical Weapons Was Known Prior to the September 2020 Protests**.

49.    After George Floyd was murdered on May 25, 2020, racial justice protests took place in cities across the county. Numerous police departments responded by using teargas and other chemical weapons against protesters.

50.    Immediately, protesters across the country reported that exposure to teargas and other chemical weapons caused menstrual irregularities.

51.    Throughout the summer of 2020, media outlets nationwide reported that protesters who were exposed to teargas and other chemical weapons were experiencing irregularities with their menstrual cycle. *See, e.g.*, Katie C. Reilly, *Police tear gas George Floyd protests despite proof it's dangerous. Time for a ban*, NBC News (June 11, 2020),

https://www.nbcnews.com/think/opinion/police-tear-gas-george-floyd-protests-despite-proof-it-

INDEX NO. E2021008206

RECEIVED NYSCEF: 04/06/2022

Case 6:22-cv-06180-FPG    Document 10-2    Filed 05/27/22    Page 12 of 35

s-ncna1229516 (noting that, tear gas "has been linked to miscarriages"); Jennifer Gerson, *Doctors Explain What You Should Know About Tear Gas & Your Period,* Bustle (June 17, 2020), https://www.bustle.com/p/can-tear-gas-affect-your-period-doctors-explain-what-to-know-22987529; Nicole Wetsman, *There isn't enough research to know if tear gas causes early periods: it's dangerous regardless*, The Verge (June 22, 2020), https://www.theverge.com/2020/6/22/21295159/tear-gas-menstural-cycle-miscarriage-period-protests; Dhruvi Chauhan, Paula Kibuka Musoke, and Goleen Samari, *Using tear gas on protesters perpetuates patterns of reproductive harm*, The Hill (June 26, 2020), https://thehill.com/opinion/healthcare/504699-using-tear-gas-on-protesters-perpetuates-patterns-of-reproductive-harm; Cecilia Nowell, *Protesters Say Tear Gas Caused Them to Get Their Period Multiple Times in a Month*, Teen Vogue (July 2, 2020), https://www.teenvogue.com/story/protestors-say-tear-gas-caused-early-menstruation; Alexandria Herr, Can tear gas mess with your period? Grist (Jul. 17, 2020), https://grist.org/justice/can-tear-gas-mess-with-your-period/; Rebecca Ellis, *'It's like they're testing it on us': Portland protesters say tear gas has caused irregularities with their periods*, OPB (July 29, 2020), https://www.opb.org/article/2020/07/29/tear-gas-period-menstrual-cycle-portland/. *Police are using tear gas, but lack of study and oversight raises health concerns,* Associated Press (Aug. 6, 2020), https://www.oregonlive.com/news/2020/08/police-are-using-tear-gas-but-lack-of-study-and-oversight-raises-health-concerns.html; Abe Asher, *Irregular Periods and Horrible Headaches: How Tear Gas Is Making Portland Sick*, VICE (Aug. 14, 2020), https://www.vice.com/en/article/4ay5mn/an-endless-barrage-of-tear-gas-is-making-portland-sick; Catherine Ryan Gregory, *Tear Gaslighting: Is There a Link Between Protesting and*

*Messed Up Periods?* Marie Claire (Aug. 21, 2020), https://www.marieclaire.com/health-fitness/a33648135/tear-gas-effects-reproductive-system/.

52.    Thus, for months prior to the September 2020 protests, Defendants had clear notice that the use of teargas and other chemical weapons causes damage to women's reproductive health, including menstrual irregularities and miscarriages.

53.    Moreover, the chemical weapons have warnings that exposure can cause harm to the female reproductive system.

54.    Nevertheless, Defendants ignored these warnings and made tear gas, pepper balls and other chemical weapons the centerpiece of their coordinated protest response plan.

55.    Pursuant to policy, on the night of September 5-6, 2020, RPD officers and/or Sheriff's Deputies attacked Ms. PIGOTT with chemical weapons. As a result, upon information and belief, Ms. PIGOTT suffered severe menstrual irregularities.

D.    **Unlawful Municipal Policies and Negligence of the City And RPD in Failing to Properly Train RPD Officers On The Proper Handling of First Amendment Assemblies, and In Failing to Supervise and Discipline Officers Who Used Excessive Force Against Protesters**.

56.    Since at least the 2009, the RPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies, including peaceful protests and lawful demonstrations.

57.    Upon information and belief, the core training provided by the CITY related to protest response is based on crowd management and disorder control tactics for policing large-scale civil disorders and riots.

58.    According to the CITY's website, the RPD's Mobile Field Force (MFF) is a "specially trained and equipped team providing a rapid, organized and disciplined response to civil disorder [and] crowd control."

59.     The MFF was the RPD's primary unit tasked with policing the peaceful protests in the wake of George Floyd and Daniel Prude in May and September 2020, respectively, and on the night of September 4-5, 2020 specifically.

60.     Upon information and belief, the MFF's training and guidelines treat peaceful protests and peaceful demonstrations as military engagements and copies military tactics and focus on tactics designed to deter, disperse, and demoralize groups, such as disorder control formations and mass use of chemical weapons.

61.     Such disperse and demoralize tactics have persisted through the present as exemplified by the experiences of Mx. PIGOTT.

62.     One such dispersal tactic is that RPD officers were trained to suddenly rush at protesters without warning in an effort to get them to disperse from the area. If they did not run away fast enough, or if the person tripped and fell, they would often be violently seized and arrested.

63.     Upon information and belief, the MFF's "civil disorder" training and guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations—only for large-scale civil disorders such as riots.

64.     However, neither the MFF's "civil disorder" training and guidelines, nor, upon information and belief, any related RPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

65.     For example, upon information and belief, there is virtually no RPD training— and certainly no meaningful RPD training—focusing on how to utilize the tactics described in the MFF's "civil disorder" training and guidelines without infringing on the constitutional rights

of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

66.     Many MFF members have histories of engaging in the kinds of misconduct complained of herein, among other places, by CRB complaints, PSS investigations and in lawsuits.

67.     Examples of the RPD's unreasonable and discriminatory use of force at prior lawful protests include:

- In October 2009, an anti-war protest in Rochester resulted in several physical confrontations, with two protesters receiving stitches at the hospital after RPD officers pushed them face-first to the ground, and 12 protesters arrested for exercising their First Amendment rights. The peaceful march, held in the early evening, was interrupted by approximately forty RPD vehicles. Within three minutes of giving the order to disperse, RPD officers began to shove and hit protesters with clubs and deploy pepper spray. Protesters described RPD officers wading through the crowd to pick out Black students to arrest. A press videographer who was filming one such arrest was wrestled to the ground by police and himself arrested.

- In May 2015, Katrina Perkins was protesting police brutality on a public street in a residential neighborhood, where two of her daughters and six of her grandchildren reside. Though Ms. Perkins was peacefully demonstrating, RPD officers violently seized and arrested her and then charged her with disorderly conduct and disruption. Those charges were dismissed two months later. Police brutality is a deeply personal

issue to Ms. Perkins, as her daughter Lashedica was the 13-year-old shot three times by former-Deputy Chief Simmons in 2005.

- In July 2016, in Rochester as across the nation, people took to the streets to uphold the sanctity of Black lives and call for an end to racist policing. In response, the RPD deployed, beat, shoved, and pepper sprayed protesters. As one described it: "I started to turn and they tackled me to the ground.…They're beating citizens for no reason whatsoever. I wasn't doing anything. I was taking pictures." RPD officers, in keeping with their pattern and practice, particularly targeted Black protesters with unlawful force, including Black journalists: Carlet Cleare and Justin Carter of WHAM-TV were both handcuffed and detained, even though Ms. Cleare was wearing a WHAM-TV shirt and they identified themselves as members of the press. Over the course of one weekend, Rochester had more arrests at its BLM protest (74) than the rest of the nation combined.

68.    Despite the wealth of evidence of RPD members' historical brutality against protesters, Defendant City has ignored, and/or failed to utilize, relevant information, including information gleaned from reports and lawsuits, as well as other data points, to identify deficiencies in RPD training as it relates to constitutionally compliant protest policing.

69.    In fact, following the 2016 protest, the RPD and Mayor Lovely Warren's office stated the police handled themselves appropriately.

70.    When questioned by public officials after the September 2020 protests, former RPD Chief La'Ron Singletary stated that he did not review the RPD's actions at the 2016 protest in developing the RPD's strategy for responding to protests in 2020.

INDEX NO. E2021008206
RECEIVED NYSCEF: 04/06/2022

71.     The City and RPD's failure to train and improper training led to widespread excessive force at the 2020 protests, as demonstrated by RPD officers body worn camera videos, media reports, and RPD subject resistance reports.  However, Based on statements by City Officials and RPD command staff to date, and publicly available information, no RPD officer has reported any fellow officer for their unlawful use of force and no RPD officers have been disciplined for their unlawful use of force on September 2, 3, 4 or 5, 2020.

72.     The City and RPD did not simply ratify excessive force through the lack of reporting and discipline. It approved the force during the demonstrations because its policies authorized these excessive levels of force. RPD training on grenadier, MFF, and crowd control tactics, as well as its subject resistance reports, show that tear gas, pepper spray, projectiles, and grenades were supplied by superiors and deployed on their orders pursuant to RPD policies on use for force. There appears to have been no consideration given to whether such force would be excessive to secure compliance with traffic laws or enforce violations or misdemeanors against nonviolent protestors.

73.     In summary, upon information and belief, the RPD's exclusive focus on deterring, dispersing, and demoralizing in trainings related to policing protests, coupled with the failure to train on specific, relevant aspects of constitutional policing of protests, let alone how to encourage or facilitate protests—despite having received clear notice that RPD policing of protests has caused the systemic violations of protesters' constitutional rights for years— demonstrates the City's negligence in failing to train and supervise RPD Officers in properly and lawfully policing protests to ensure that protesters' rights under the First Amendment, Fourth Amendment, Fourteenth Amendment, and other, related rights are not violated. As a result of the City's negligence, Plaintiff was injured and harmed, as described herein.

E. **Unlawful Municipal Policies and Negligence of the COUNTY and Sheriff BAXTER in Failing to Properly Train Sheriff's Deputies On The Proper Handling of First Amendment Assemblies, and In Failing to Supervise and Discipline Sheriff's Deputies Who Used Excessive Force Against Protesters**.

74.    Prior to September 2020, the COUNTY and BAXTER had received clear notice that peaceful protests and lawful demonstrations have occurred and will continue to occur in Monroe County, and that without proper training, his Deputy Sheriffs would violate individuals' constitutional rights and endanger the life and safety of protesters, such as Plaintiff.

75.    The COUNTY and BAXTER deliberately disregarded the fact that peaceful protests and peaceful demonstrations have occurred and will continue to occur in Monroe County, and instead has trained his Deputies that such lawful First Amendment activities constitute "civil disturbances" that mut be policed in the same manner as "violent mobs" or "riots."

76.    The COUNTY and BAXTER, upon information and belief, took no steps to train Sheriff's Deputies on lawfully policing protests and other First Amendment activities.

77.    Instead, the COUNTY and BAXTER, trained Sheriff's Deputies to respond to First Amendment assemblies pursuant to the County's Hazard Mitigation Plan, which defines a "civil disturbance" as both "peaceful demonstrations or acts of violence."

78.    Upon information and belief, the Hazard Mitigation Plan was in full force and effect at all times relevant herein.

79.    Upon information and belief, prior to 2020 and at all times relevant herein, the COUNTY and BAXTER had implemented the Hazard Mitigation Plan, and trained Sheriff's Deputies in accordance with its mandates. Thus, the COUNTY and BAXTER explicitly conflate peaceful protests and peaceful demonstration with violent riots.

Case 6:22-cv-06180-FPG    Document 10-2    Filed 05/27/22    Page 19 of 35

80.    Upon information and belief, the COUNTY and BAXTER did not provide any training to Sheriff's Deputies on drawing a meaningful distinction between "peaceful demonstrations" and "violent mobs". For example, in its "Hazard Mitigation Plan," the County states that, "Many civil unrest incidents are spontaneous and can occur at any time, rendering prediction of probability of future occurrences difficult. When these incidents occur, they can become extremely disruptive and difficult to control. Assumedly, civil unrest incidents including marches, protests, demonstrations, and gatherings will continue to occur throughout Monroe County."

81.    According to the Hazard Mitigation Plan, peaceful protests and demonstrations are discouraged because of the perceived negative impacts on property resources, real estate and the economy.

82.    Upon information and belief, the COUNTY and BAXTER do not provide any training to Sheriff's Deputies on how to encourage and support individuals engaging in "peaceful demonstrations" to ensure that their constitutional rights are not violated by law enforcement officers.

83.    Upon information and belief, the COUNTY and BAXTER do not provide any training to Sheriff's Deputies on making a meaningful distinction between how Sheriff's Deputies are trained and instructed on policing "peaceful demonstrations", "peaceful protests" versus "violent mobs" and riots.

84.    Instead, the Hazard Mitigation Plan states that, "[m]any protests intended to be peaceful demonstrations to the public and the government can escalate into general chaos."

85.    Upon information and belief, the COUNTY and BAXTER train Sheriff's Deputies to police peaceful demonstrations in the same manner as they would a violent mob.

86.     Like the RPD, upon information and belief, BAXTER trains Sheriff's Deputies exclusively on deterring, dispersing, and demoralizing protests and peaceful demonstrations.

87.     In June 2020, several Monroe County Legislators called on BAXTER to implement new protest training to ensure the safety of protesters at Black Lives Matter demonstrations. The legislators drafted a letter to County Executive Adam Bello and BAXTER in which they made a number of requests related to public safety and the safety of protesters, and closed by stating, "Once again, we believe the safety of both protesters, motorists, and law enforcement is of the utmost importance. Right here in Monroe County and across the Nation, we have seen the negative results when leaders are reactionary rather than proactive. Please be sure that a plan is in place to ensure the mutual safety of all involved."

88.     BAXTER claimed the letter was a "political stunt" and refused to provide any specific details regarding how Sheriff's Deputies would ensure the safety of protesters during peaceful demonstrations

89.     As a result of the COUNTY's unlawful policies, practices and customs, and BAXTER's negligence, Plaintiff was injured and harmed, as described herein.

## V.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:
### Municipal Liability

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's First, Fourth and Fourteenth Amendment Rights***
**(Against the City)**

90.     All preceding and subsequent paragraphs are incorporated by reference.

91.     All of the wrongful acts or omissions complained of herein against Plaintiff and other protesters were carried out by the individually named and unnamed RPD officers pursuant to: (a) formal policies, rules, and procedures of Defendant CITY; (b) actions and decisions by

Defendant CITY's policymaking agents; (c) customs, practices, and usage of the RPD that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by CITY policymaking officials; (d) Defendant CITY's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the CITY's failures, and the failures of the other policymaking agents, to train, supervise, and discipline RPD officers, despite full knowledge of the their wrongful acts against Plaintiff and other protesters, as described herein.

92.      Accordingly, Plaintiff was harmed as a direct result of Defendants' unlawful conduct and is entitled to damages, injunctive relief, and reasonable attorney's fees and costs in an amount to be determined by the Court.

<u>**SECOND CLAIM FOR RELIEF**</u>
<u>**Municipal Liability and Supervisory Liability**</u>

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' First, Fourth and Fourteenth Amendment Rights During the Summer and Fall 2020 Racial Justice Protests***
**(Against the COUNTY and BAXTER)**

93.      All preceding and subsequent paragraphs are incorporated by reference.

94.      All of the wrongful acts or omissions complained of herein against Plaintiff and other protesters were carried out by the individually named and unnamed MCSO employees and/or Sheriff's Deputies pursuant to: (a) formal policies, rules, and procedures of Defendants COUNTY and BAXTER; (b) actions and decisions by policymaking agents of the COUNTY and MCSO, including, but not limited to, Defendant BAXTER; (c) customs, practices, and usage of the MCSO that are so widespread and pervasive as to constitute de facto policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendants COUNTY, MCSO and BAXTER, and other policymaking officials; (d) Defendant COUNTY, MCSO and

BAXTER's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by their failures, and the failures of the other policymaking agents, to train, supervise, and discipline MCSO employees and/or Sheriff's Deputies, despite full knowledge of their wrongful acts Plaintiffs and other protesters, as described herein.

95.     As a result of the foregoing, Plaintiff suffered injuries and damages.

<u>**THIRD CLAIM FOR RELIEF**</u>
**Excessive Force**
***Pursuant to 42 U.S.C. § 1983***

96.     All preceding and subsequent paragraphs are incorporated by reference.

97.     The actions of the John Doe RPD officers and Richard Roe Sheriff's Deputies towards Plaintiff on September 5-6, 2020 constitute excessive force in violation of 4th and 14th Amendments of the United States Constitution and 42 U.S.C. § 1983.

98.     Defendants used force against Ms. PIGOTT that was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted them.

99.     The force used against Ms. PIGOTT on September 5-6, 2020 constituted a seizure under the Fourth Amendment.

100.    It was objectively unreasonable for the RPD Officers and/or Sheriff's Deputies to use military grade weapons, "less-than-lethal" weapons, and chemical weapons against Ms. PIGOTT on September 5-6, 2020, without first having made an individualized determination that it was reasonable to use any force Ms. PIGOTT based on her own individual conduct, instead of any perceived "group conduct." This conduct constitutes a seizure under the 4th Amendment.

101.    It was objectively unreasonable for RPD officers and/or Sheriff's Deputies to shoot a tear gas cannister at Ms. PIGOTT from close range when she was taking cover in the nook of the building on State Street, causing her to be engulfed in tear gas.

102.    It was objectively unreasonable for RPD officers and/or Sheriff's Deputies to shoot Ms. PIGOTT in the chest with a pepper ball from close range when she was taking cover in the nook on State Street.

103.    It was objectively unreasonable for officers to run at Ms. PIGOTT and shoot pepper balls at her when she was present on Fitzhugh Street in the vicinity of Spiritus Christie church.

104.    The types and levels of force Defendants used against Ms. PIGOTT were in contravention of, or inconsistent with, related policies and/or training.

105.    As a result of the acts and omissions of the RPD officers and/or Sheriff's Deputies, Defendants deprived Ms. PIGOTT of her federal, state, and/or other legal rights; caused Ms. PIGOTT bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Ms. PIGOTT to expend costs and expenses; has prevented Ms. PIGOTT from becoming pregnant; and/or otherwise damaged and injured Ms. PIGOTT.

106.    The actions of the RPD officers and Sheriff's Deputies were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

107.    Accordingly, Plaintiff was harmed as a direct result of Defendants' unlawful conduct and is entitled to damages, injunctive relief, and reasonable attorney's fees and costs in an amount to be determined by the Court.

### FOURTH CLAIM FOR RELIEF
**Assault and Battery**
***Pursuant to New York State Law***.

INDEX NO. E2021008206

RECEIVED NYSCEF: 04/06/2022

108.    All preceding and subsequent paragraphs are incorporated by reference.

109.    RPD Officers and/or Sheriff's Deputies intentionally used military grade weapons, "less-than-lethal" weapons, and chemical weapons against Ms. PIGOTT on September 5-6, 2020 without first having made an individualized determination that it was reasonable to use any force against Plaintiff based on her own individual conduct, instead of any perceived "group conduct."

110.    RPD Officers and/or Sheriff's Deputies intentionally shot Ms. PIGOTT in the back as she was wheeling away from them and attempting to disperse from the area.

111.    The types and levels of force Defendants used against Ms. PIGOTT were in contravention of, or inconsistent with, related policies and/or training.

112.    Ms. PIGOTT was not threatening the law enforcement officers or any other person at any time.

113.    By the aforedescribed conduct, defendants, their agents, servants and employees, acting within the scope of their employment, intentionally, willfully and maliciously battered Plaintiff Ms. PIGOTT, when they, in a hostile and/or offensive manner struck Plaintiff—including by subjecting her to tear gas and other chemicals—without her consent and with the intention of causing harmful and/or offensive bodily contact to the Plaintiff and caused such battery.

114.    The RPD Officers were at all times agents, servants, and employees acting within the scope of their employment by the Defendant CITY and the RPD, which are therefore responsible for their conduct.

115.    The Defendant CITY, as the employer of the individual RPD defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

116.    At no point during the incidents described herein did the circumstances necessitate or support the above applications of force utilized by the defendant RPD officers and/or Sheriff's Deputies against Plaintiff.

117.    The actions of the RPD officers and Sheriff's Deputies were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

118.    Accordingly, Plaintiff was harmed as a direct result of Defendants' unlawful conduct and is entitled to damages, injunctive relief, and reasonable attorney's fees and costs in an amount to be determined by the Court.

## FIFTH CLAIM FOR RELIEF
### First Amendment Infringements, Including First Amendment Retaliation
### *Pursuant to 42 U.S.C. § 1983*

119.    All preceding and subsequent paragraphs are incorporated by reference.

120.    In committing the acts and omissions complained of herein, Defendants acted under color of state law—individually, in concert, and through a conspiracy—to deprive Plaintiff of the rights protected by the First Amendment to the United States Constitution.

121.    Defendants (a) retaliated against Plaintiff for engaging in speech and/or conduct protected by the First Amendment, and (b) imposed restrictions on such protected speech and/or conduct that violated Plaintiff's First Amendment rights, including, but not limited to, in arresting Plaintiff, in subjecting Plaintiff to excessive force, in selectively enforcing laws and regulations against Plaintiff, and in otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

122.    Defendants engaged in those and other acts and omissions complained of herein in retaliation for Plaintiff's protected speech and/or conduct.

123.    Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiff from continuing to engage in such protected speech and/or conduct.

124.    Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiff from engaging in similar protected conduct in the future.

125.    As a result of Defendants' actions, Plaintiff's speech was chilled.

126.    The unlawful conduct of the individual defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

127.    Accordingly, Plaintiff was harmed as a direct result of Defendants' unlawful conduct and is entitled to damages, injunctive relief, and reasonable attorney's fees and costs in an amount to be determined by the Court.

### SIXTH CLAIM FOR RELIEF
**Failure To Intervene**
***Pursuant to 42 U.S.C. § 1983***

128.    All preceding and subsequent paragraphs are incorporated by reference.

129.    The individual defendants all had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of her constitutional rights by the other Defendant RPD officers and Sheriff's Deputies, and other law enforcement.

130.    The individual defendants failed to intervene on Plaintiff's behalf despite having had realistic opportunities to do so.

131.    The individual defendants failed to intervene on Plaintiff's behalf despite having substantially contributed to the circumstances within which Plaintiff's rights were violated by their affirmative conduct.

132.    As a result of the aforementioned conduct of the individual defendants, Plaintiff's constitutional rights were violated.

133.    Defendants' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

134.    Accordingly, Plaintiff was harmed as a direct result of Defendants' unlawful conduct and is entitled to damages, injunctive relief, and reasonable attorney's fees and costs in an amount to be determined by the Court.

## SEVENTH CLAIM FOR RELIEF

### Negligent Training, Supervision and Discipline
### (Against BAXTER)

135.    All preceding and subsequent paragraphs are incorporated by reference.

136.    Defendant BAXTER was negligent in the training, supervision and discipline of the Defendant Sheriff's Deputies, who were provided, upon information and belief, no training for policing protests, engaging in peaceful crowd control, or how to properly and safely use the "less lethal" weapons.

137.    Alternatively, the training BAXTER provided to the Sheriff's Deputies was inadequate.

138.    Moreover, despite their use of extreme and excessive violence against protesters on September 2-6, 2020, BAXTER was negligent in failing to supervise or discipline any of his Sheriff's Deputies related to any force used protesters on those nights prior to Plaintiff's injury. BAXTER's negligence was the direct and proximate cause of Plaintiff's injuries.

139.    BAXTER's negligence in failing to supervise and discipline his Sheriff's Deputies was the direct and proximate cause of Plaintiff's injuries.

140.    As a result of the foregoing, Plaintiff suffered injuries and damages.

## EIGHTH CLAIM FOR RELIEF
**Negligent Planning of the Protest Response**
**(Against BAXTER)**

141.    All preceding and subsequent paragraphs are incorporated by reference.

142.    Defendant BAXTER was negligent in planning the response of his Sheriff's Deputies to the protests.

143.    BAXTER had a special duty to ensure that the rights of Plaintiff and other protesters to free speech, expression and to assemble under the First Amendment to the United States Constitution, and Article I, section 8 of the New York State Constitution, were not violated, and that protesters were not assaulted, battered, subjected to excessive force and/or falsely arrested by law enforcement.

144.    BAXTER breached his duty to keep demonstrators safe by, among other things, coordinating with the CITY and RPD to develop and implement a protest response plan that instructed his Sheriff's Deputies that Black Lives Matter protests are led by a nationwide conspiracy of outside agitators bent on violence; this manifested in the training of Sheriff's Deputies that what seem to be peaceful demonstrators are a shield deliberately sent to the front lines to screen the throwing of objects from the rear. That training conveniently justifies and encourages suppressing all protestors by collectively punishing nonviolent ones. The message to their officers was clear: there is no such thing as a peaceful protestor.

145.    BAXTER breached his duty to Plaintiff and other protesters by implementing a protest response plan that violated the rights to free speech, expression and to assemble.

146.    BAXTER breached his duty to Plaintiff and other protesters by implementing a protest response plan that conflated peaceful protests and demonstrations with violent mobs and riots; thus, BAXTER knew or should have known that in the absence of a proper protest

Case 6:22-cv-06180-FPG   Document 10-2   Filed 05/27/22   Page 29 of 35

INDEX NO. E2021008206
RECEIVED NYSCEF: 04/06/2022

response plan, his Sheriff's Deputies would use unreasonable and excessive force against peaceful demonstrators, like Plaintiff.

147.    BAXTER breached his duty to Plaintiff and other protesters by implementing a protest response plan that instructed his Sheriff's Deputies to use chemical weapons against protesters; however, based on national news reports in the months before the September protests, BAXTER knew or should have known that exposure to chemical weapons such as pepper balls, tear gas and OC spray can cause serious adverse health effects, including menstrual irregularities.

148.    BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies to police peaceful demonstrations in the same manner as they would police violent mobs.

149.    BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies to use chemical weapons indiscriminately against protesters.

150.    BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies to that they could shoot pepper balls and other "less-than-lethal" projectiles at protesters' heads.

151.    BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies to use "less-than-lethal" weapons and chemical weapons against "groups" of protesters based on perceived "group conduct", without making any individualized determination that they were legally justified to use force against any individual in the perceived "group."

152.    Plaintiff's injuries were a direct and proximate result BAXTER negligently planning the response to the protests.

153.    As a result of the foregoing, Plaintiff suffered injuries and damages.

### NINTH CLAIM FOR RELIEF
**Negligent Planning of the Protest Response**
**(Against the CITY)**

154.    All preceding and subsequent paragraphs are incorporated by reference.

155.    The CITY and RPD were negligent in planning the response to the protests.

156.    The CITY had a special duty to ensure that the rights of Plaintiff and other protesters to free speech, expression and to assemble under Article I, section 8 of the New York State Constitution were not violated, and that protesters were not assaulted, battered, subjected to excessive force and/or falsely arrested by law enforcement.

157.    For months before the body worn camera video of RPD officers brutally killing Daniel Prude was released, the CITY and RPD anticipated and planned for large-scale protests when the video was eventually released. During those several months—from at least June 4, 2020 to September 2, 2020—the CITY and RPD developed a protest response plan that included responding to peaceful protests with extreme violence; using military-grade weapons against protesters; using overwhelming amounts of chemical weapons against groups of protesters, without making individualized determinations that probable cause existed to believe that any individual within the group had committed a crime or violation; and otherwise to retaliate against protesters based on their objection to the message protesters were expressing.

158.    The CITY and RPD breached its duty to Plaintiff and other protesters by failing to implement any plan whatsoever for how to ensure that RPD officers protected and promoted

protesters rights to free speech, expression and to assemble under Article I, section 8 of the New York State Constitution, and the New York Right to Monitor Act.

159.    The City and RPD breached its duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed RPD officers that Black Lives Matter protests are led by a nationwide conspiracy of outside agitators bent on violence; this manifested in the training of RPD officers that what seem to be peaceful demonstrators are a shield deliberately sent to the front lines to screen the throwing of objects from the rear. That training conveniently justifies and encourages suppressing all protestors by collectively punishing nonviolent ones. The message to their officers was clear: there is no such thing as a peaceful protestor.

160.    The CITY and RPD breached its duty to Plaintiff and other protesters by implementing a protest response plan that affirmatively violated protesters' rights to free speech, expression and to assemble under First Amendment of the United States Constitution and Article I, section 8 of the New York State Constitution, and the New York Right to Monitor Act.

161.    The CITY and RPD breached its duty to Plaintiff and other protesters by implementing a protest response plan that instructed its officers to use extreme violence, militarized police tactics, military-grade weapons, and chemical weapons against protesters.

162.    The CITY knew or should have known that its protest plan was unlawful and that implementation of its plan would cause protesters rights to free speech, expression and to assemble under the First Amendment of the United States Constitution and Article I, section 8 of the New York State Constitution to be violated; and that RPD officers and other law enforcement officers would cause serious injuries to protesters.

INDEX NO. E2021008206

RECEIVED NYSCEF: 04/06/2022

Case 6:22-cv-06180-FPG    Document 10-2    Filed 05/27/22    Page 32 of 35

163.    The CITY and RPD knew that at past protests, numerous RPD officers had seriously injured peaceful demonstrators; and that in the absence of a proper protest response plan, RPD officers would use unreasonable and excessive force against peaceful demonstrators and falsely arrest them.

164.    The CITY knew or should have known that exposure to chemical weapons such as pepper balls, tear gas and OC spray can cause serious adverse health effects—as same had been widely reported around the county in the months prior to the RPD's use of said chemical weapons in September 2020.

165.    The CITY breached his duty to keep demonstrators safe by, among other things, failing to implement a lawful protest response plan, and instead training RPD officers to police peaceful demonstrations in the same manner as they would police violent mobs or riots.

166.    The CITY breached its duty to keep demonstrators safe by implementing a protest response plan which, among other things, instructed RPD officers to use chemical weapons against protesters in the absence of individualized probable cause – despite knowing of the serious adverse health effects such chemical weapons would cause.

167.    The CITY breached its duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed RPD officers to use "less-than-lethal" weapons and chemical weapons against "groups" of protesters based on perceived "group conduct", without making any individualized determination that they were legally justified to use force against any individual in the perceived "group."

168.    The CITY breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that failed to properly instruct RPD officers on their duty

to intervene to prevent the violation of protesters rights by other RPD officers, Sheriff's Deputies, and/or other law enforcement officials.

169.    The CITY breached his duty to keep demonstrators safe by implementing a protest response plan that caused the violation of Plaintiff's rights in all other ways detailed herein.

170.    Plaintiff's injuries were a direct and proximate result of the CITY's implementation of its negligent a protest response plan.

171.    As a result of the foregoing, Plaintiff suffered injuries and damages.

### **TENTH CLAIM FOR RELIEF**
#### **Negligence**
#### **(Against the Individual Defendants)**

172.    All preceding and subsequent paragraphs are incorporated by reference.

173.    The Defendant RPD officers and Sheriff's Deputies, their agents, servants, employees, officers and deputies were negligent using the "less lethal" military grade weapons and chemical weapons against Plaintiff, which was the direct and proximate cause of Plaintiff's injuries sustained on September 5-6, 2020.

174.    The Defendant RPD officers and Sheriff's Deputies had a duty to permit the protesters to engage in First Amendment Activities and to protect them from harm or physical violence.

175.    The Defendant RPD officers and Sheriff's Deputies had a duty to not use force against any individual protester in the absence of individualized cause or legal justification for the use of force.

176.    The Defendant RPD officers and Sheriff's Deputies breached that duty by firing "less lethal" munitions and chemical weapons into "groups" of protesters based on perceived

INDEX NO. E2021008206

RECEIVED NYSCEF: 04/06/2022

"group conduct," without making any individualized determination that they were legally justified to use force against any individual in the perceived "group."

177.     The breach of that duty by the Defendant RPD officers and Sheriff's Deputies was the direct and proximately cause of Ms. PIGOTT's serious injuries described herein.

178.     Defendant RPD officers and/or Sheriff's Deputies' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

179.     Accordingly, Plaintiff was harmed as a direct result of Defendants' unlawful conduct and is entitled to damages, injunctive relief, and reasonable attorney's fees and costs in an amount to be determined by the Court.

WHEREFORE and in light of the foregoing, Plaintiff demands judgment on all claims for relief:

a.      Empanel a jury;

b.      Award compensatory and punitive damages;

c.      The Plaintiff demands the foregoing relief jointly and severally against all of the defendants in an amount in excess of the jurisdiction of all lower Courts, except that the punitive damages demands are, as a matter of law, not recoverable against a municipality and therefore are not made against the City or County;

d.      Award Plaintiff reasonable attorney's fees and costs, and interest pursuant to 42 U.S.C. § 1988; and

e.      Such other and further relief as the court may deem just and proper.

INDEX NO. E2021008206

RECEIVED NYSCEF: 04/06/2022

Case 6:22-cv-06180-FPG   Document 10-2   Filed 05/27/22   Page 35 of 35

Dated:          New York, New York          Respectfully Submitted,
                April 6, 2022

                                            ROTH & ROTH, LLP.


                                            _____
                                            Elliot Dolby Shields
                                            Co-counsel for Plaintiffs
                                            192 Lexington Avenue, Suite 802
                                            New York, New York 10024
                                            (212) 425-1020

                                            Donald Thompson
                                            Co-counsel for Plaintiffs
                                            16 West Main Street, Suite 243
                                            Rochester, New York 14614
                                            Ph: (585) 423-8290